

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,                          18-CR-235-LJV-MJR

                  Plaintiff,

                                      REPORT AND
vs.                                                RECOMMENDATION/
                                        DECISION AND ORDER

ROBERT CHAPLINE,

                  Defendant.

_____

       This case has been referred to the undersigned by the Hon. Lawrence J. Vilardo pursuant to 28 U.S.C. § 636(b)(1) for supervision of pre-trial proceedings and to hear and report on all suppression motions. *See* Dkt. No. 31.

       On November 27, 2018, a Federal Grand Jury returned an indictment charging the Defendant with a total of thirteen counts and one forfeiture allegation: two counts of production of child pornography in violation of 18 U.S.C. §§ 2251(a) and 2251(e), one count of receipt of child pornography in violation of 18 U.S.C. §§ 2251A(a)(2)(A) and 2252A(b), and ten counts of possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B). Dkt. No. 29 at 1-9. The forfeiture allegation concerned ten data processing and data storage devices pursuant to 18 U.S.C. §§ 2253(a)(1) and 2253(a)(3). *Id.* at 10-11.

       On April 15, 2019, Defendant filed an omnibus pretrial motion for discovery including a 1) Motion for Discovery and Inspection; 2) Motion to Compel Defendant's Access to All Discovery Material; 3) Motion for Disclosure of Informant Information; 4) Motion to Compel *Brady* Material; 5) Motion for Evidence Pursuant to Federal Rules of

Evidence 404(b), 608 and 609; 6) Motion for Early Disclosure of *Jenck's* Act Material; 7) Motion for Preservation of Rough Notes; 8) Motion to Dismiss Count 1 or Count 2 as Multiplicitous; 9) Motion to Suppress Physical Evidence; and 10) Motion for Leave to File Additional Motions. Dkt. No. 39 at 1-2. On May 6, 2019, the Government filed a response to the Defendant's pretrial motions. Dkt. No. 40. On May 24, 2019, the Court scheduled an evidentiary hearing on the Defendant's motion to suppress all evidence of child pornography found on a Sumsung Tablet ("Tablet") and a SanDisk Extreme Pro SD card ("Card") and all evidence obtained as a direct result of the search of the Tablet or Card. *See* Dkt. Nos. 39 at 19; 42.

The evidentiary hearing on the motion to suppress took place on June 10, 2019 and June 27, 2019. On June 10, 2019, the Government called Jim Cross to testify. Tr. 1.[1] On June 27, 2019, the Government called the following witnesses: Jennifer Chapline ("Ms. Chapline"), Hamburg Police Detective Sergeant Scott Kashino ("Detective Sergeant Kashino"), Hamburg Police Detective Sergeant Timothy Crawford ("Detective Sergeant Crawford"), FBI Special Agent Randall Garver ("Special Agent Garver"), and FBI Supervisory Special Agent Greg Winsor ("Special Agent Winsor"). Tr. 2. The Defendant did not call any witnesses to testify. The parties filed post-hearing briefs. Dkt. Nos. 52, 53, 54, and 55. The Court heard oral argument on September 30, 2019 and deemed the matter submitted. Dkt. No. 56.

After considering the evidence adduced at the hearing, the submissions of the parties, and argument from counsel, it is recommended that the District Court deny

---

[1] References herein to "Tr. 1" are to the transcript of the evidentiary hearing held on June 10, 2019, which appears on the Court Docket at Docket #50. References to "Ex." are to exhibits introduced during the hearing.

Defendant's motion to suppress in its entirety. The Court orders the Defendant's other discovery motions be granted and denied as outlined below.

## BACKGROUND AND FINDINGS OF FACT[2]

The Defendant and Jennifer Chapline[3] married in 2001 and have four children together. Tr. 2 at 7-9.[4] In December 2016, the Defendant and his family moved from Maryland into a three-bedroom apartment in the Town of Hamburg, New York. Tr. 2 at 9-10. The family brought with them numerous electronic devices to New York, including a desktop computer, laptop computer, tablet, and the Defendant's cellphone. Tr. 2 at 10-11. The majority of the computer equipment was stored inside an unlocked black cabinet in the living room of the residence, which was accessible to all members of the family. Tr. 2 at 11, 14.

On October 2, 2017, the Defendant suffered a stroke and was admitted to Buffalo General Hospital. Tr. 2 at 15. After learning of the stroke, the Defendant's best friend, Jim Cross ("Cross"), traveled from Ohio to Buffalo on October 5, 2017, to visit the Defendant and assist Ms. Chapline as she took over responsibility for running the household. Tr. 1 at 11, 15, and 39. On October 6, 2017, Cross visited Defendant in the hospital. Tr. 1 at 15.

During that visit, the Defendant asked Cross to come close to him and then whispered to Cross that he had "bad stuff" on his electronic devices, and asked Cross to delete items from those devices. Tr. 1 at 15. The Defendant provided Cross with the

---

[2] Background and Findings of Fact are taken primarily from the hearing on Defendant's motion to suppress, accompanying exhibits, and the parties' submissions related to the motion to suppress.

[3] Ms. Chapline was known as Bambi at the time of these events.

[4] References herein to "Tr. 2" are to the transcript of the evidentiary hearing held on June 27, 2019, which appears on the Court Docket at Docket #51.

passwords to his desktop computer, laptop computer, Tablet, and Samsung cellphone. Tr. 1 at 16. The desktop computer and the laptop had the same password, and the Tablet and the cellphone had the same password. Tr. 1 at 17. Neither party presented evidence that Cross looked at the Card or that any type of password or passcode restricted access to it. Ms. Chapline and the Defendant's brother were present in the hospital room during the conversation between the Defendant and Cross.[5] Tr. 1 at 42; Tr. 2 at 58-59.

As instructed, Cross went to the Chapline residence where he accessed the desktop computer which was located in the black cabinet in the living room of the residence. Tr. 1 at 18-19. Cross searched through the entire computer and deleted any suspect files by moving them to the Recycle Bin. Tr. 1 at 20-21. After finishing with the desktop computer, Cross told Ms. Chapline what he was doing and generally what he found on the computer. Tr. 1 at 32-33. Cross then accessed the laptop computer and Tablet and deleted any suspect files after conducting a thorough search of both devices. Tr. 1 at 25-28. On the third day of his visit, Cross cleaned "bad stuff" off of Defendant's cellphone, also at the Defendant's request. Tr. 1 at 28-30. Cross informed the Defendant that he had cleaned up all of the Defendant's devices, and the Defendant thanked Cross. Tr. 1 at 35-36. Cross returned to Ohio on October 8, 2017 and provided the passwords and passcodes for the devices to Ms. Chapline before he left. Tr. 1 at 50; Tr. 2 at 22.

Following Cross' departure, Ms. Chapline used the passwords that Cross had provided to her to access the desktop computer, laptop computer, Tablet, and the Defendant's cellphone. Tr. 2 at 26-29. Ms. Chapline claims she needed to access the

---

[5] Ms. Chapline testified that the Defendant asked her to leave to the room while Defendant quietly spoke to Cross. Tr. 2 at 17. However, she stayed and stepped into a spot where the Defendant could not see her because of his impaired vision. *Id.* She therefore heard the conversation, but the Defendant may not have known she was listening.

devices to pay bills, view family photos, and access music and tax documents. Tr. 2 at 22-24, 27. Ms. Chapline also searched the desktop computer, laptop computer, Tablet and the cell phone for suspect files. Tr. 2 at 26-30. Although Ms. Chapline did not locate pornography of any kind, she did not access the contents of the Recycle Bin as she was not familiar with the Recycle Bin. Tr. 2 at 28-29. Ms. Chapline copied family photos and tax returns onto a USB thumb drive. Tr. 2 at 30.

During his hospitalization, the Defendant made statements to Ms. Chapline about dangerous pictures on the computer. Tr. 2 at 26. He also stated that he was not a monster and would never hurt a child. Tr. 2 at 26, 30. As a result of these statements, Ms. Chapline learned that the Defendant may have sexually abused a minor female victim ("Victim"). Tr. 2 at 30. On Friday, October 13, 2017, Ms. Chapline drove to the Hamburg Police station to file a police report. Tr. 2 at 30-31. At the police station, Ms. Chapline met with Detective Sergeant Kashino. Tr. 2 at 31-32, 34, 78. During her visit, she was highly emotional and had difficulty verbalizing the information she wanted to provide, and, therefore, wrote out some notes. Tr. 2 at 31-32, 34, 78; Ex. 2, Ex. 3. Ms. Chapline stated that she had computers and other electronic items in her house that she wanted searched immediately. Tr. 2 at 35, 81. Detective Sergeant Kashino recalled that Ms. Chapline stated that she had been on the computers, and based on his conversation with Ms. Chapline, he believed that she had the authority to access the computers. Tr. 2 at 81-82, 86-87, 126. Ms. Chapline executed a consent to search form entitled "TOWN OF HAMBURG POLICE DEPARMENT CONSENT TO SEARCH ("Consent to Search form"). Tr. 2 at 36-38, 82-83 Ex. 5. The form gave the Hamburg Police the authority to "conduct

a complete search of: My Desk Top and Lap Top Computers."[6] Furthermore, there is a space below the signature line entitled, "Itemized List of Article Taken as Evidence." All parties agree that neither the police nor Ms. Chapline completed this section during her visit to the police department. Tr. 2 at 32.

Later that day, Detective Sergeant Crawford, who had no prior role in the case, visited the Chapline residence to collect the electronic equipment from Ms. Chapline. Tr. 2 at 130. During his visit, Ms. Chapline provided the passwords to the desktop computer and the Samsung cell phone to him. Tr. 2 at 134-135; Ex. 6. In total, Ms. Chapline turned over 12 items to Detective Sergeant Crawford including the Tablet and Card. Tr. 2 at 137-138; Ex. 5. He reviewed the items with her and took them to the station where he completed the section "Itemized List of Articles Taken as Evidence" with the items he received from Ms. Chapline. Tr. 2 at 137-138; Ex. 5. Detective Sergeant Crawford then left the electronic items, the completed Consent to Search form, and a piece of paper with the passwords for the desktop computer and cell phone in Detective Sergeant Kashino's cubicle. Tr. 2 at 137-138. At no time during their conversation did Ms. Chapline tell Crawford that she did not use the equipment or that she only recently learned the passwords to the devices. Tr. 2 at 138. Rather, Detective Sergeant Crawford testified that he recalled Ms. Chapline telling him that these devices "were used by her and him." Tr. 2 at 145. Based on the circumstances presented to Detective Sergeant Crawford, he believed that Ms. Chapline had the authority to consent to a search of the electronic items. Tr. 2 at 139, 148.

---

[6] This referred to Ms. Chapline's Desk Top and Lap Top Computers.

On Monday morning, October 16, 2017, Detective Sergeant Kashino logged the electronic items Detective Sergeant Crawford retrieved from Ms. Chapline into their evidence tracking system, and then brought the items to the Regional Computer Forensic Laboratory ("RCFL"), which is a computer forensic laboratory run by the FBI. Tr. 2 at 88-89, 126-127, 209, 232. At the RCFL, Detective Sergeant Kashino, with the assistance of RCFL personnel, including Special Agent Winsor who was the director of the lab, analyzed most of the electronic items on the loose media kiosk and the cellphone investigative kiosk, and observed child pornography on some of the devices. Tr. 2 at 91, 94-95, 232-234, 237; Ex. 1. Detective Sergeant Kashino left four of the electronic items at the RCFL, including the desktop computer and laptop computer, which could not be searched using the investigative kiosks, and notated in yellow highlighter on the Consent to Search form the items that remained at the RCFL. Tr. 2 at 96-97, 115; Ex. 1; Ex. 5.

On the morning of October 16, 2017, Special Agent Garver called Ms. Chapline after hearing from a co-worker of a possible child pornography matter that she was involved in, and learned that Ms. Chapline had already met with the Hamburg Police Department. Tr. 2 at 153-154. At that point, Special Agent Garver contacted Detective Sergeant Kashino to arrange a time to meet with Ms. Chapline in person to get more of the details of her complaint. Tr. 2 at 154-155. Special Agent Garver did not discuss anything relating to electronic devices at that time, and was unaware that Detective Sergeant Kashino was on the way to the RCFL. Tr. 2 at 155. On October 17, 2017, Ms. Chapline met with Special Agent Garver, FBI Task Force Officer Michael Hockwater, and Detective Sergeant Kashino at the Hamburg police station, at which time Special Agent Garver learned more details about the electronic equipment that Ms. Chapline had

accessed and provided to the Hamburg police, and was provided with a copy of the Consent to Search form. Tr. 2 at 158-159, 167, 209. Following this meeting, and based on the consent of Ms. Chapline, the FBI conducted a further search of the Chapline residence and storage unit for items of evidentiary value. Tr. 2 at 160-163; Ex. 9; Ex. 19.

Sometime during the afternoon of October 17, 2017, or the morning of October 18, 2017, Special Agent Winsor called Special Agent Garver and informed him that employees at the RCFL observed child pornography on two of the devices previously searched by Detective Sergeant Kashino. Tr. 2 at 169-170. The record indicates that Special Agent Garver did not seek out this information and did not feel it was important to the probable cause analysis in the search warrant that he was preparing to search all of the electronic equipment provided by Ms. Chapline. Tr. 2 at 170-171. However, Special Agent Garver did include this information in the warrant applications he submitted to this Court on October 20, 2017. Tr. 2 at 171; Ex. 14A; Ex. 15A. Ultimately, the Court authorized two search warrants on October 20, 2017, for all of the electronic equipment Ms. Chapline had provided to Hamburg police together with several items not included in the Consent to Search form. Tr. 2 at 173; Ex. 14B; Ex. 15B. Prior to obtaining these search warrants, neither Special Agent Garver nor anyone in the FBI Child Exploitation Unit searched the items provided by Ms. Chapline. Tr. 2 at 175.

The Court finds all of the witnesses who testified at the suppression hearing to be credible. Although some witnesses gave different accounts regarding some of the events in this particular case, each witness testified to the best of his or her recollection.

# DISCUSSION

I.    Motion to Suppress Evidence of Child Pornography Found on Samsung Tablet and SanDisk Extreme Pro SD Card.

Defendant moves to suppress evidence of child pornography on the Tablet and Card and all subsequent evidence found relying upon the search of those items. *See* Dkt. No. 39 at 19. The two warrant applications at issue were presented to this Court on October 20, 2017 and this Court issued the requested warrants. Exs. 14A-B; 15A-B. Specifically, Defendant objects to a part of paragraph 10 in those warrant applications at issue. It states in relevant part, "An FBI Supervisory Special Agent from the RCFL advised that he observed child pornography on item 2, the Samsung Galaxy Tablet. . . . and on item 7, the SanDisk Pro SD card. Your affiant has not reviewed any results of the items that have already been searched." Exs 14A and 15A at ¶¶ 10.[7] Defendant argues that this tainted the warrant application and, therefore, the warrant. As a consequence the Defendant asks the Court to apply the exclusionary rule to all evidence obtained by the warrants as "fruit of the poisonous tree." The Court disagrees.

---

[7] For purposes of this analysis, the applications are identical. The only differences are the attachments which outline the items the FBI wished to search. The FBI sought the first warrant to search 19 electronic items for all visual depictions of child pornography, information related to an interest in child pornography or the visual depiction of the sexual exploitation of a child, documents and records regarding ownership of the items, and permission to take photographs . Ex. 14A at Attachment A. These items included the 12 Ms. Chapline gave Detective Sergeant Crawford plus an additional seven items the FBI found during a subsequent search, none of which are at issue in this motion to suppress. The FBI sought the second warrant to search a locked Samsonite briefcase for eight items including clothing, DNA and trace evidence, evidence of sexual activity, various visual depictions relating to child pornography, computer passwords and forensics, all information related to the Defendant's internet service provider, documents and records regarding ownership of the searched property, and Any photographs of the property to be searched and where they were found.  items. Ex. 15A at Attachments A-B.

A. _The Evidence on the Tablet and Card is Admissible Based on the Independent Source Doctrine_

First, the Court finds that the warrants are still valid under the independent source doctrine. In _Nix v. Williams_, the Supreme Court explained the relationship between the independent source doctrine and the exclusionary rule:

> The core rationale consistently advanced by this Court for extending the exclusionary rule to evidence that is the fruit of unlawful police conduct has been that this admittedly drastic and socially costly course is needed to deter police from violations of constitutional and statutory protections. This Court has accepted the argument that the way to ensure such protections is to exclude evidence seized as a result of such violations notwithstanding the high social cost of letting persons obviously guilty go unpunished for their crimes. On this rationale, the prosecution is not to be put in a better position than it would have been in if no illegality had transpired.
>
> By contrast, the derivative evidence analysis ensures that the prosecution is not put in a _worse_ position simply because of some earlier police error or misconduct. The independent source doctrine allows admission of evidence that has been discovered by means wholly independent of any constitutional violation.

467 U.S. 431, 442-43 (1984).

As the court noted in _United States v. Nayyar_,

> Where a warrant-authorized search is preceded by a warrantless entry, the Supreme Court has explained that evidence would not be suppressed if "[n]one of the information on which the warrant was secured was derived from or related in any way to the [unlawful] entry . . . [and] the information came from sources wholly unconnected with the entry and was known to the agents well before the [illegal] entry." _Segura v. United States_, 468 U.S. 796, 814, 104 S. Ct. 3380, 82 L. Ed. 2d 599 (1984). Where a warrant-authorized search is preceded by a warrantless _search_, "[t]he ultimate question [] is whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue []. This would not have been the case if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant." _Murray v. United States_, 487 U.S. 533, 542, 108 S. Ct. 2529, 101 L. Ed. 2d 472 (1988) (footnote omitted).

221 F. Supp. 3d 454, 466 (S.D.N.Y 2016).

*United States v. Johnson*, 994 F.2d 980 (2d Cir. 1993) outlines a two-pronged test the test for determining whether the independent source doctrine applies: (1) the warrant must be supported by probable cause derived from sources independent of the illegal entry; and (2) the decision to seek the warrant may not be prompted by information gleaned from the illegal conduct." *United States v. Johnson*, 994 F.2d 980, 987 (2d Cir. 1993) citing *Murray v. United States*, 487 U.S. 533 (1988).

The first prong's analysis begins with the two warrant applications at issue and the facts used to support the probable cause determination. Exs. 14A, 15A. On October 13, 2017, Special Agent Garver received information from a fellow FBI employee that a family friend "was involved in a situation relating to the possession of child pornography." *Id.* at ¶¶ 5. On October 16, 2017, Special Agent Garver contacted Ms. Chapline who had already filed a complaint with the Hamburg Police Department and turned over some electronic items and data storage devices to that department. *Id.*

On October 17, 2017, Special Agent Garver, an FBI colleague, and Detective Sergeant Kashino interviewed Ms. Chapline. *Id.* at ¶¶ 6. She described how her husband was in Buffalo General Hospital due to a stroke. She described how he said some strange things on October 2, 2017 including "I would never hurt a child" and "I am not a monster." *Id.* Although she initially dismissed them as a result of the medicine the defendant was taking, a week later, Defendant asked Ms. Chapline, "have you seen the pictures?" and noted the pictures were "very dangerous." *Id.* Defendant was intent on getting his Samsung Galaxy phone. *Id.* He also wanted to see the Victim. *Id.* In addition, Defendant's 19-year old son reported observing his father looking at naked images on the Samsung

phone in the hospital. *Id.* Ms. Chapline also described what the Victim told her about the abuse. *Id.* at ¶¶ 7-8, 11, 13.

Special Agent Garver describes a forensic interview with the Victim on October 17, 2017. *Id.* at ¶ 13. The Victim outlines an encounter with Defendant in which he molested her and "showed her pictures and videos on his tablet (believed to be item 2 [in the list of requested items to search attached to the warrant application] and laptop computer that were of adults and children having sex." *Id.* at ¶¶ 13. The Victim describes how the Defendant "had her dress in two different pair of undersized, nearly clear, short shorts[,] and a shirt and took pictures of her[.] Victim saw the pictures before [the Defendant] deleted them." *Id.*

The applications describe an October 20, 2017 interview between the FBI and Cross. *Id.* at ¶¶ 15. In that interview, Cross described his visit with the Defendant, the Defendant's request to delete the images, and how Cross deleted the images from the devices. *Id.* In that interview, the FBI located Mr. Cross and interviewed him. He stated that the Defendant told him that "some of the bad stuff is child pornography."[8] *Id.* at ¶ 15.

All of this evidence was derived from sources outside of the RCFL, the lab that conducted the analysis of the Tablet and Card. This evidence satisfies the probable cause standard for the Court to issue the warrants.

---

[8] During his testimony, Cross never discussed this statement when asked about his conversations with the Defendant in the hospital. See Tr. 1. Neither did either party directly asked him about this statement.. Neither party addresses this statement in their papers. The Government does not raise it in support of their argument that the application contains probable cause absent the inclusion of the tainted material. The defense does not challenge the statement or claim it is "materially false and misleading." *United States v. Mullen*, 451 F. Supp. 2d 509, 539 (W.D.N.Y. 2006). The Court accepts it as true and must consider it in the determination of whether sufficient probable cause existed to issue the warrant with the tainted material removed from the application.

The second prong requires the Court to determine whether the decision to seek the warrant was prompted by information gleaned from the illegal conduct. Special Agent Garver testified to the following during the evidentiary hearing:

> Q. Now, prior to receiving these items on the 19th, did you learn about any items or any evidence located on any of these devices listed here on document -- Government Exhibit 11, did you learn somehow about what might have been on these devices based on a search that was done?
>
> A. Yes. Some time on either the afternoon of October 17th or the morning of October 18th Supervisory Special Agent Greg Winsor called me. At the time I was drafting a search warrant, and he said that during their search they had seen -- they had observed child pornography.

Tr. 2 at 169.

Special Agent Garver clearly testifies that he in the process of drafting the search warrant applications when he learned the results of the allegedly illegal search. The Court is satisfied that Special Agent Garver did not decide to seek the search warrants based on the results of the illegal search. For this reason, the Court concludes the independent source doctrine applies and serves as a basis for not excluding the evidence on the Tablet and Card.

    B. *The Evidence on the Tablet and Card are Admissible Based on the Principle of Inevitable Discovery*

Even if this Court were to agree with the Defendant that the warrants were invalid, the evidence is still admissible through the related doctrine of inevitable discovery. The inevitable discovery doctrine holds that "evidence that was illegally obtained will not be suppressed if the Government can prove that the evidence would have been obtained inevitably even if there had been no statutory or constitutional violation." *United States v. Mendez*, 315 F.3d 132, 137 (2d Cir. 2002)(internal quotation marks and citations omitted).

"The exception requires the district court to determine, viewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred." *United States v. Cabassa*, 62 F.3d 470, 473 (2d Cir. 1995)(quoting *United States v. Eng*, 997 F.2d 987, 990 (2d Cir. 1993)). The Second Circuit noted in *United States v. Heath* that "the Government cannot prevail under the inevitable discovery doctrine merely by establishing that it is more probable than not that the disputed evidence would have been obtained without the constitutional violation. On the contrary, we held in *Cabassa* that proving that a judge could validly have issued a warrant supported by probable cause was not necessarily enough to establish that a judge would have issued the warrant in question." 455 F.3d 52, 58-59 (2d Cir. 2006)(internal citation omitted). "The government bears the burden of proving inevitable discovery by a preponderance of the evidence." *United States v. Rucker*, No. 15-CR-6079-FPG-JWF, 2018 U.S. Dist. LEXIS 33607, at *13 (W.D.N.Y. Mar. 1, 2018) quoting *United States v. Stokes*, 733 F.3d 438, 444 (2d Cir. 2013)

During oral argument, the parties stipulated to the fact that that the desktop and laptop contained child pornography. The Consent to Search form specifically gives law enforcement permission to search the desktop and laptop. Ex. 5. The defense does not challenge Ms. Chapline's consent to search the desktop and laptop through that form. In fact, the Defendant relies upon it to bolster their argument that the search of the Tablet and Card violated the Fourth Amendment because they were not included in the Consent to Search form. Dkt. No. 53 at 17-18 Surely, once the desk top and lap top were searched pursuant to the Consent to Search form, a court would have issued a warrant to search the remaining items Ms. Chapline turned over to law enforcement, which include the

Tablet and Card. Law enforcement would have found the evidence on the Tablet and Card at that point. Based on the principle of inevitable discovery, this Court recommends that the District Court Judge deny Defendant's motion to suppress evidence found on the Tablet and Card and all evidence stemming from the warrants issued by this Court.[9]

II.  Non-Dispositive Motions

    A.  *Motion for Discovery and Inspection*

First, the Defendant makes a motion for discovery and inspection. Federal criminal discovery and inspection is generally governed by Federal Rules of Criminal Procedure ("Fed R. Crim. P.") 16 ("Rule 16"). Defendant moves for Rule 16 discovery both generally and as to specific items throughout its omnibus motion. Fed R. Crim. P. 16(a) requires the Government to disclose certain evidence and information upon request of a Defendant. While Rule 16 was intended to provide for liberal discovery, a Defendant is not entitled to discovery of "the entirety of the Government's case against him." *United States v. Percevault*, 490 F.2d 126, 130 (2d Cir. 1974). Rule 16 provides that a Defendant is entitled to the following: 1) a Defendant's written, recorded or oral statements in the possession of the Government; 2) the Defendant's prior record; 3) documents, objects, books, papers, photographs, etc. that will be used during the Government's case-in-chief; 4) reports of examinations or tests; 5) and information about expert witnesses in accordance with Federal Rules of Evidence ("Fed. R. Evid.") 702, 703 and 705. *See* Fed R. Crim. P. 16(a)(1). Rule 16 specifically exempts from disclosure "reports, memorandum, or other internal Government documents made by an attorney for the Government or

---

[9] As the evidence is admissible under the doctrines of Independent Source and Inevitable Discovery, the Court will not address the actual or apparent authority arguments raised by the Government.

other Government agent in connection with investigating or prosecuting the case." *See* Fed. R. Crim. P. 16(a)(2).

The Defendant concedes that it has "received voluntary discovery from the government." Dkt. No. 39 at 2. The Defendant acknowledges that the Government has made discovery material reasonably available to defense counsel. *Id.* at 4, fn. 1. The Defendant uses this motion to make "additional specific requests." *Id.* Specifically, the Defendant moves to compel the following items: 1) access to any and all image and video evidence obtained pursuant to the search of Mr. Chapline's computers (laptop and desktop), tablet, phones, cameras, as well as any hard drives or memory disks relating to these devices; 2) mirror copies of all hard drives, memory disks, or other devices which do not contain alleged child pornography; 3) copies of all media (pictures and videos) seized from Defendant's property or discovered as a result of searches thereof, which the Government does not contend constitute child pornography; 4) any and all audio and/or video recordings made in this case and any transcripts, draft or otherwise, prepared of those recordings; 5) any and all color photographs regarding Defendant's arrest and the search of his property; 6) any and all federal and state police reports related to Defendant's arrest and the search of his property; 7) a copy of any *Miranda* waiver form utilized in the case, whether signed or not; 8) copies of any and all consent forms utilized in the case, whether signed or not; 9) copies of any and all reports related to the booking process in this case; 10) disclosure of the names and identities of expert witnesses that the Government intends to call at trial, their qualifications, subject of testimony, and reports and the results of tests, examinations or experiments which are material to the preparation of Defendant's defense or which are intended for use by the Government in

its evidence-in-chief at trial; 11) any relevant written or recorded statements made by the Defendant and the substance of any oral statement which the Government intends to offer in evidence at the trial made by Defendant, whether before or after arrest, in response to interrogation by any person then known to the Defendant to be a Government agent; 12) copies of all rough notes taken as part of this investigation whether or not they have been incorporated in official records; 13) a copy of any search warrant or arrest warrant applied for and/or issued or denied during the course of this investigation (whether local, state, or federal); and 14) pursuant to Rule 12(b)(4) of the Federal Rules of Criminal Procedure, the Defendant requests written notification of any evidence the Government intends to use at its case-in-chief that may, in any way, be subject to a motion to suppress in which the Defendant is entitled to discover pursuant to Rule 16. Dkt. No. 39 at 2-3. The defense claims that these requests "are made merely to insure (sic) that all discovery required by Rule 16 is turned over." *Id.* at 2.

The Government responds that, as of its response, it has fully complied with Rule 16. Dkt. No. 40 at 12. In addition, as of its response, it was still in the process of transferring electronic data to a thumb drive provided by the defense for review by a defense expert. *Id.* The Government further responds that, as it pertains to expert witnesses, it will comply with Fed. R. Crim. P. 16(a)(1)(G). *Id.* In addition, with respect to the requests that fall under the *Jencks* Act, the Government responds that it has already provided the defense with all witness statements in the case and it will provide the statements of any witnesses as they are identified. *Id.* Given the Government's representations in this matter and the Defendant's admission that the Government is making discovery material available, this motion is DENIED.

B. *Motion to Compel Defendant's Access to All Discovery*

The parties previously resolved this motion. Therefore, the motion is deemed moot.

C. *Motion for Disclosure of Informant Information*

The Defendant next moves for disclosure of informant information. The Government responds that no Government informants were utilized during the investigation of the Defendant. Dkt. No. 40 at 14. Given the Government's representation, this motion is DENIED.

D. *Motion to Compel Disclosure of Brady Material*

The defense next moves for an order compelling the Government to disclose all potentially exculpatory and favorable evidence as required by *Brady v. Maryland*, 373 U.S.C. 83 (1963). Dkt. No. 39 at 7-10 The Government has an obligation to disclose exculpatory material, or material favorable to an accused as to either guilt or punishment, even when no affirmative request has been made. *Brady*, 373 U.S. at 87. Material "favorable to an accused" includes not only evidence that affirmatively tends to exculpate the Defendant, but also information that impeaches the credibility of Government witnesses. *See Giglio v. United States*, 405 U.S. 150, 154-55 (1972). The test for materiality is whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). Evidence may be material for *Brady* purposes even if it is not admissible, as long as it could lead to the discovery of admissible evidence. *United States v. Gill*, 297 F.3d 93, 104 (2d Cir. 2002). "[A]s a general rule, *Brady* and its progeny do not require immediate disclosure of all exculpatory and impeachment material upon request by a Defendant." *United States v. Coppa*, 267 F.3d 132, 146 (2d Cir. 2001).

"[A]s long as a Defendant possesses *Brady* evidence in time for its effective use, the Government has not deprived the Defendant of due process of law simply because it did not produce the evidence sooner." *Id.* at 144.

The Government indicates that it has disclosed all *Brady* material in its possession and acknowledges its continuing duty under *Brady* to produce such material, if and when it is made aware of it. Dkt. No. 40 at 15. Given these representations, Defendant's motion to compel the production of *Brady/Giglio* material is DENIED. Consistent with *Coppa*, the Government shall continue to timely disclose any *Brady* and *Giglio* material to the Defendant that it should become aware of as this case progresses. *See United States v. Padovani*, No. 14-CR-00224, 2016 WL 5402696, at *4 (WDNY Sept. 28, 2016).

   E. *Motion for Evidence Pursuant to Federal Rules of Evidence 404(b), 608, and 609*

The defense next moves for an order compelling the disclosure of evidence under Federal Rules of Evidence (Fed. R. Evid.) 404(b), 608, and 609. With respect to Fed R. Evid. 404(b), the Government states in its papers that it will "provide notification of any Rule 404(b) evidence it intends to introduce at trial well in advance of trial." Dkt. 40 at 15. The Government also notes that it will provide Defendant with more definitive 404(b) notice when ordered by the trial judge. *Id.*

With respect to the Rule 608 request, the Defendant requests the Government turn over any "specific instances of misconduct" the Government intends to use against the Defendant should he testify. Dkt. 39 at 11. The Government is non-responsive to the Defendant's specific request under Rule 608 but represents that it will provide any

impeachment evidence concerning the Government's witnesses in accordance with any scheduling order set by the District Court Judge. Dkt. No. 40 at 16.

Finally, the Defendant requests notice any intent by the Government to use prior convictions to impeach the credibility of the Defendant, should the Defendant testify at trial under Fed. R. Evid. 609. Dkt. No. 39 at 12. With respect to the Rule 609 request, the Government represents that the Defendant does have prior convictions and a criminal history will be provided to the Defendant as part of discovery. Dkt. No. 40 at 16. However, the Government asserts that the Defendant is not "entitled to pretrial disclosure of additional evidence the Government intends to use to cross-examine him should he testify at trial." *Id.*

All of the evidence sought by the defense under these sections is usually disclosed under the schedule order set by the District Court Judge. For this reason, Defendant's motion to compel under Fed. R. Evid. 404(b), 608, and 609 is denied without prejudice to renew their motion before the District Court Judge.

F. *Motion for Early Disclosure of Jenck's Act Material*

Defendants request the early disclosure of all statements and reports of witness statements. Dkt. No. 39 at 12. As noted above, the Government indicates that it has already provided all witness statements in the case and will continue to do so as additional witnesses and/or witnesses statements are identified. Dkt. No. 40 at 12. In light of these representations, Defendant's request for early disclosure of witness statements is DENIED.[10]

---

[10] To the extent Defendant is requesting statements of non-testifying witnesses with this request, this motion is also DENIED. As previously stated, the Government has no obligation to produce the statements of individuals who are not testifying at trial. *United States v. Rigas*, 583 F.3d 108, 125-26 (2d Cir. 2009). However, in the event a non-testifying witness's statement contains exculpatory information or

G. *Motion for Preservation of Rough Notes*

The Defendant next moves the Court for an order requiring all Government agents to preserve their rough notes. See Dkt. No. 39, pp. 14-15. The Government represents that it agrees to the request and has already instructed the agents involved in this case to preserve their rough notes. Dkt. No. 40 at 16-17. Given this representation, the motion to compel the preservation of rough notes is DENIED.

H. *Motion to Dismiss Count 1 or Count 2 as Multiplicitous*

The Defendant next argues that Counts 1 and 2 are duplicative and moves for dismissal of one of the counts. See Dkt. No. 39 at 15-17. The defense argues that Counts 1 and 2 "contain no distinguishing factual allegations, and the date range set forth in Count 1 wholly encompasses the range set forth in Count 2." *Id.* at 17. The defense states that "[a]s a single act – for instance, the production of child pornography in January 2017 – would constitute a violation of both Count 1 and Count 2, these Counts are multiplicitous. The Government argues that Count 1 relates to child pornographic images of the Victim produced by the Defendant on or about December 10, 2012 while Count 2 relates to the images produced by the Defendant on or about February 13, 2016. Dkt. 40 at 11, 18.

The Court rejects the defense's argument. First, there is over a three-year gap between the event leading to Count 1 and the event leading to Count 2. Furthermore, events taking place on the same day can lead to different counts in the indictment. *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932); *United States v. Tashbook*, 144 Fed.Appx. 610, 614-15 (9th Cir. 2005), cert. denied, 546 U.S.

---

information that would impeach the credibility of a Government witness, that material is subject to disclosure pursuant to *Brady v. Maryland*, 373 U.S. 83, 87 (1963) and *Giglio v. United States*, 405 U.S. 150, 154-55 (1972).

1050 (2005); *United States v. Esch*, 832 F.2d 531, 541-42 (10th Cir. 1987), cert. denied, 485 U.S. 908 (1988). The ultimate question is whether the Government can prove separate facts for each count. Despite the overlapping time, there are sufficient differences in the counts to maintain both counts. For these reasons, Defendant's motion is DENIED.

I.    *Motion for Leave to File Additional Motions*

The Defendant indicates in his papers that he is moving for leave to file additional motions but never addresses it substantively in his papers. Likewise, the Government never addresses it either. To the extent the Defendant intends to bring motions based upon new information or evidence that has not yet been disclosed, their request for leave to file additional motions is GRANTED. To the extent the Defendant intends to bring motions concerning issues that could have been raised prior to the previous motion deadline, Defendant' request is DENIED without prejudice to bring the motions upon a showing of good cause for the untimely filing.

## CONCLUSION

For the foregoing reasons, it is recommended that the Defendant's motion to suppress evidence (Dkt. No. 39) be denied in its entirety and the Defendant's other pretrial motions are decided in the manner set forth above.

Pursuant to 28 U.S.C. §636(b)(1), it is hereby ORDERED that this Report and Recommendation be filed with the Clerk of Court.

Unless otherwise ordered by Judge Vilardo, any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this Report and Recommendation in accordance with the above statute, Rules 59(b),

45(a), and 45(c) of the Federal Rules of Criminal Procedure, and Local Rule of Criminal Procedure 59. Any requests for an extension of this deadline must be made to Judge Vilardo.

*Failure to file objections, or to request an extension of time to file objections, within fourteen days of service of this Report and Recommendation WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.* See Small v. Sec'y of Health & Human Servs., 892 F.2d 15 (2d Cir. 1989).

The District Court will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the Magistrate Judge in the first instance. *See Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 990-91 (1st Cir. 1988).

Pursuant to Local Rule of Criminal Procedure 59(c)(2), written objections "shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." *Failure to comply with these provisions may result in the District Court's refusal to consider the objection.*

**SO ORDERED**.

Dated:      October 30, 2019
            Buffalo, New York

MICHAEL J. ROEMER
United States Magistrate Judge